# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-20174

United States Court of Appeals
Fifth Circuit

**FILED**

April 21, 2017

Lyle W. Cayce
Clerk

ARIANA M.,

> Plaintiff - Appellant

v.

HUMANA HEALTH PLAN OF TEXAS, INCORPORATED,

> Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before PRADO, HIGGINSON, and COSTA, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

Plaintiff-Appellant Ariana M. challenges Defendant-Appellee Humana Health Plan of Texas's denial of coverage for continued partial hospitalization. After reviewing the administrative record, the district court granted Defendant's motion for summary judgment. We AFFIRM.

## I.

Plaintiff is a dependent eligible for benefits under the Eyesys Vision Inc. group health plan (the "Plan"), which is insured and administered by Humana. The Plan's benefits include coverage for partial hospitalization for mental health treatment. However, benefits are payable only for treatments that are "medically necessary." "Medically necessary" is defined as

No. 16-20174

health care services that a health care practitioner exercising prudent clinical judgment would provide to his or her patient for the purpose of preventing, evaluating, diagnosing or treating an illness or bodily injury, or its symptoms. Such health care service must be:

- In accordance with nationally recognized standards of medical practice;
- Clinically appropriate in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness or bodily injury;
- Not primarily for the convenience of the patient, physician or other health care provider; and
- Not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of the patient's sickness or bodily injury.

For the purpose of medically necessary, generally accepted standards of medical practice means standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, Physician Specialty Society recommendations, the views of physicians practicing in relevant clinical areas and any other relevant factors.

Plaintiff has a long history of mental illness, eating disorders, and engaging in self-harm. On April 15, 2013, Plaintiff was admitted to Avalon Hills's intensive partial hospitalization program. Partial hospitalization refers to a level of care in which a patient attends medical programming for approximately eight hours per day. This form of care is more intensive than either intensive outpatient or outpatient care.

2

No. 16-20174

Defendant initially found the treatment medically necessary and approved partial hospitalization through April 19, 2013, ultimately extending authorization through June 4, 2013, for a total of 49 days. On June 5, 2013, Defendant denied continued partial hospitalization treatment, finding that it was no longer medically necessary. In making its determination, Defendant asked two doctors to review Plaintiff's medical treatment, using the Mihalik criteria, a privately licensed review criteria created by the Mihalik Group.

Plaintiff filed her Complaint on November 7, 2014. On February 12, 2015, Plaintiff filed a motion to determine the standard of review, arguing that Defendant's denial of benefits should be reviewed de novo. Defendant responded, conceding that de novo review applies to plan term interpretations; however, Defendant also noted that under Fifth Circuit law, even when de novo review applies, factual determinations are reviewed for abuse of discretion. Noting the parties' agreement, the district court granted Plaintiff's motion. Defendant next filed a motion for summary judgment along with the administrative record. Plaintiff responded. The district court granted the motion for summary judgment. Plaintiff appealed.

II.

Plaintiff argues that the district court erred by applying an abuse of discretion, instead of a de novo, standard to assess Defendant's factual determinations. We disagree.

The Employee Retirement Income Security Act of 1974's ("ERISA") text "does not directly resolve" the question of the appropriate standard of review of an ERISA plan administrator's decision to deny plan benefits. *Conkright v. Frommert*, 559 U.S. 506, 512 (2010). In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), the Supreme Court held that "[c]onsistent with established principles of trust law, . . . a denial of benefits challenged under [ERISA] is to be reviewed under a de novo standard unless the benefit plan

No. 16-20174

gives the administrator . . . discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115. Accordingly, where an ERISA plan delegates discretionary authority to the plan administrator (a "discretionary clause") courts review the plan administrator's decisions for abuse of discretion. *See, e.g.*, *Barhan v. Ry-Ron Inc.*, 121 F.3d 198, 201 (5th Cir. 1997).

In *Pierre v. Connecticut General Life Insurance Co./Life Insurance Co. of North America*, 932 F.2d 1552 (5th Cir. 1991), we interpreted *Firestone* to "not require de novo review for factual determinations" and instead found that "an abuse of discretion standard of review is appropriate" for reviewing a plan administrator's factual determinations. *Id.* at 1553. Accordingly, in this Circuit, "with or without a discretion[ary] clause, a district court rejects an administrator's factual determinations in the course of a benefits review only upon the showing of an abuse of discretion." *Dutka ex rel. Estate of T.M. v. AIG Life Ins. Co.*, 573 F.3d 210, 212 (5th Cir. 2009); *see also Green v. Life Ins. Co. of N. Am.*, 754 F.3d 324, 329 (5th Cir. 2014) (quoting *Dutka* and noting that the standard of review for factual determinations is abuse of discretion regardless of the presence of a discretionary clause).

Plaintiff argues that *Pierre* deference does not apply here because Texas's anti-discretionary clause law mandates de novo review. Texas Insurance Code Section 1701.062(a) provides that "[a]n insurer may not use a document described by Section 1701.002 [among other things, policies for health and medical insurance] in this state if the document contains a discretionary clause." Tex. Ins. Code § 1701.062(a). Under the statute, discretionary clauses include any provision that "purports or acts to bind the claimant to, or grant deference in subsequent proceedings to, adverse eligibility or claim decisions or policy interpretations by the insurer" or "specifies . . . a standard of review in any appeal process that gives deference

4

No. 16-20174

to the original claim decision or provides standards of interpretation or review that are inconsistent with the laws of this state, including the common law." Tex. Ins. Code § 1701.062(b)(1), (2)(D).[1]

Plaintiff argues that these provisions, taken together, required the district court to review Humana's factual findings de novo. We disagree. The plain text of the statute provides only that a discretionary clause cannot be written into an insurance policy; it does not mandate a standard of review. As always, statutory interpretation begins "with the plain language and structure of the statute." *Coserv Ltd. Liab. Corp. v. Sw. Bell Tel. Co.*, 350 F.3d 482, 486 (5th Cir. 2003). Texas's anti-discretionary clause law, by its terms, does not mandate a standard of review. Instead, it provides only that an insurer "may not use a document . . . if the document contains a discretionary clause." Tex. Ins. Code § 1701.062(a). That is, Texas's anti-discretionary clause law concerns what language can and cannot be put into an insurance contract in Texas. It does not mandate a specific standard of review for insurance claims. *See Am. Council of Life Insurers v. Ross*, 558 F.3d 600, 609 (6th Cir. 2009) ("[It is not] necessarily the case . . . that, if Michigan can remove discretionary clauses, it will be allowed to dictate the standard of review for all ERISA benefits claims. All that today's case does is allow a State to remove a potential conflict of interest."); *Curtis v. Metro. Life Ins. Co.*, No. 15-CV-2328, 2016 WL 2346739, at \*10 (N.D. Tex. May 4, 2016) (applying Texas's anti-discretionary clause law, but finding that factual findings should be reviewed for abuse of discretion); *Garza v. United Healthcare Ins. Co.*, No. 16-CV-0853, ECF No. 30 (S.D. Tex. Jan 31, 2017) (same); *Unum Life Ins. Co. of Am., v. Mohedano*, No. 13-CV-446, 2017 WL 713791, at \*5 n.7 (S.D. Tex. Feb. 23, 2017) ("District

---

[1] Texas has also adopted administrative rules that are substantively identical to the Insurance Code. *See* 28 Tex. Admin. Code §§ 3.1201-3.1203.

No. 16-20174

courts continue to follow [*Pierre*'s] mandate regarding factual determinations even where the discretionary clause is void.").

Accordingly, we find that Texas's anti-discretionary clause law does not change this court's normal *Pierre* deference.[2]

## III.

Plaintiff next argues that the district court erred in granting Defendant summary judgment even if an abuse of discretion standard applies. Plaintiff raises two issues. First, she argues that Defendant erred by using the Mihalik criteria, instead of the raw Plan terms or the American Psychiatric Association's Practice Guidelines, to assess medical necessity. Second, she argues that under any criterion, her continued partial hospitalization was medically necessary. We disagree.

"Standard summary judgment rules control in ERISA cases." *Cooper v. Hewlett-Packard Co.*, 592 F.3d 645, 651 (5th Cir. 2009) (quoting *Vercher v. Alexander & Alexander Inc.*, 379 F.3d 222, 225 (5th Cir. 2004)). "We review a 'district court's grant of summary judgment de novo, applying the same standards as the district court.'" *Green*, 754 F.3d at 329 (quoting *Cooper*, 592 F.3d at 651). "Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). "This court reviews de novo the district court's conclusion that an ERISA plan administrator did not abuse

---

[2] Plaintiff argues that the court should reexamine *Pierre*. Nonetheless, Plaintiff concedes that "one panel of this Court cannot overrule another, and that the ultimate resolution of the issue in this Court would likely require en banc consideration." Plaintiff is not alone in her criticism of *Pierre*; indeed, *Pierre* has been rejected by most other Circuit Courts. Moreover, *Pierre* is likely to become more important as more states adopt anti-discretionary clause statutes. Under *Firestone*, courts defer to discretionary clauses in plan documents. Until states began banning discretionary clauses, *Pierre*'s impact was limited because this court was likely to defer to a plan administrator's factual determination under the terms of the plan—not under *Pierre*.

No. 16-20174

its discretion in denying benefits . . . ." *Anderson v. Cytec Indus., Inc.*, 619 F.3d 505, 511 (5th Cir. 2010). "A plan administrator abuses its discretion if it acts 'arbitrarily or capriciously.'" *Truitt v. Unum Life Ins. Co. of Am.*, 729 F.3d 497, 508 (5th Cir. 2013) (quoting *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 214 (5th Cir. 1999)). "A decision is arbitrary and capricious only if it is 'made without a rational connection between the known facts and the decision or between the found facts and the decision.'" *Id.* (quoting *Meditrust*, 168 F.3d at 215).[3] "In addition to not being arbitrary and capricious, the plan administrator's decision to deny benefits must be supported by substantial evidence." *Anderson*, 619 F.3d at 512. "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Corry v. Liberty Life Assurance Co. of Bos.*, 499 F.3d 389, 398 (5th Cir. 2007) (quoting *Ellis v. Liberty Life Assurance Co. of Bos.*, 394 F.3d 262, 273 (5th Cir. 2004)).

## A.

Plaintiff contends that the plan administrator should not have used the Mihalik criteria to determine medical necessity because the criteria were not mentioned in the Plan's definition of medical necessity. Plaintiff further contends that the Mihalik criteria are inconsistent with the Plan's terms because they are not consistent with "nationally recognized standards of medical practice." We disagree.

First, the fact that the Plan does not expressly incorporate the Mihalik criteria does not indicate that their use in the claims adjudication procedure was improper. Instead, the Mihalik criteria simply provide Defendant's claims adjudicators guidance in carrying out the terms of the Plan. Importantly,

---

[3] This court also considers a plan administrator's conflict of interest in assessing whether the plan administrator abused its discretion. *Truitt*, 729 F.3d at 508. Plaintiff made a conflict of interest argument below, but no longer presses the argument on appeal.

nothing in the Mihalik criteria's definition of medical necessity is inconsistent with the Plan's terms as the following table indicates:

| CRITERIA FOR DETERMINING MEDICAL NECESSITY | |
|---|---|
| Plan Definition | Mihalik criteria |
| [H]ealth care services that a health care practitioner exercising prudent clinical judgment would provide to his or her patient for the purposes of preventing, evaluating, diagnosing or treating an illness or bodily injury, or its symptoms. | Intended to identify or treat a behavioral disorder or condition that causes pain or suffering, threatens life, or results in illness as manifested by impairment in social, occupational, scholastic, or role functioning. |
| In accordance with nationally recognized standards of medical practice. | Consistent with nationally accepted standards of medical practice. |
| Clinically appropriate in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness or bodily injury. | Individualized, specific and consistent with the individual's signs, symptoms, history and diagnosis.<br><br>Reasonably expected to help restore or maintain the individual's health or to improve or prevent deterioration in the individual's behavioral disorder or condition. |
| Not primarily for the convenience of the patient, physician or other health care provider. | Not primarily for the convenience of the individual, provider or another party. |
| Not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of the patient's sickness or bodily injury. | Provided in the least restrictive setting that balances safety, effectiveness and efficiency. |

What the Mihalik criteria add to the Plan definition is additional guidance for determining medical necessity in specific situations. But even these additions map onto the Plan definition of medical necessity:

| MEDICAL NECESSITY OF PARTIAL HOSPITALIZATION | |
|---|---|
| Plan Definition | Mihalik criteria |
| [H]ealth care services that a health care practitioner exercising prudent clinical judgment would provide to his or her patient for the purposes of preventing, evaluating, diagnosing or treating an illness or bodily injury, or its symptoms. | PM.A.g.3. The services must be reasonably expected to help restore or maintain the individual's health, improve or prevent deterioration of the individual's behavioral disorder or condition, or delay progression in a clinically meaningful way of a behavioral health disorder or condition characterized by a progressively deteriorating course when that disorder or condition is the focus of treatment for this episode of care. |

No. 16-20174

| In accordance with nationally recognized standards of medical practice. | PM.A.g.l. The services must be consistent with nationally accepted standards of medical practice. |
|---|---|
| Clinically appropriate in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness or bodily injury. | PM.A.g.2. The services must be individualized, specific, and consistent with the individual's signs, symptoms, history, and diagnosis.<br><br>PM.A.g.4. The individual complies with the essential elements of treatment. |
| Not primarily for the convenience of the patient, physician or other health care provider. | PM.A.g.5. The services are not primarily for the convenience of the individual, provider, or another party.<br><br>PM.A.g.6. Services are not being sought as a way to potentially avoid legal proceedings, incarceration, or other legal consequences.<br><br>PM.A.g.7. The services are not predominantly domiciliary or custodial. |
| Not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of the patient's sickness or bodily injury. | PM.A.g.8. No exclusionary criteria of the health plan or benefit package are met. |

The Mihalik criteria further list a number of specific treatment initiation and treatment continuation criteria, all of which fit comfortably within the Plan's definition of medically necessary. For example, the Mihalik criteria instruct a physician reviewing a request for mental health treatment to consider, among other things, "[w]ith treatment at this level, the individual is capable of controlling behaviors and/or seeking professional help when not in a structured treatment setting[]," and "[i]f the services being proposed have been attempted previously without significant therapeutic benefit, there is a clinically credible rationale for why those same services could be effective now." These questions simply add context to the Plan's definition of medically necessary.

Importantly, "an insurer's reliance on a pre-published plan to determine what is 'medically necessary' can be reasonable under ERISA." *Quality Infusion Care Inc. v. Aetna Life Ins. Co.*, 257 F. App'x 735, 736 (5th Cir. 2007)

No. 16-20174

(unpublished) (citing *Dowden v. Blue Cross & Blue Shield of Tex., Inc.*, 126 F.3d 641, 644 (5th Cir. 1997)).  And this practice appears to be commonplace. *See, e.g.*, *Love v. Dell, Inc.*, 551 F.3d 333, 337 (5th Cir. 2008) ("As was ValueOptions' policy, its reviewers employed the American Society of Addiction Medicine, Inc. Patient Placement Criteria for the Treatment of Substance Related Disorders, Second Edition Revised, in evaluating Love's claims."); *Dowden*, 126 F.3d at 644 ("Relying upon learned publications, Dr. Benjamin V. Carnovale, along with other medical and legal staff developed a written policy for the uniform processing of the claims of silicone breast implant patients. Consistent with the insurance contract, the policy also enumerates which procedures are medically necessary.").

Put another way, we hold that an insurer is permitted to rely on medical review criteria to make coverage decisions so long as those criteria are not inconsistent with the plan's terms.

Second, Plaintiff is incorrect that the Mihalik criteria do not represent nationally recognized standards of medical practice.  Instead, the record indicates that the Mihalik criteria are intended to represent nationally recognized standards of medical practice, were created in consultation with a group of doctors and health professionals from across the country, and were based on extensive medical literature.  Plaintiff does not point to any record evidence indicating that the Mihalik criteria do not represent a nationally recognized standard of medical practice.  Plaintiff additionally argues that Defendant should have used the guidelines created by the American Psychiatric Association.  But Plaintiff does not contend that the Plan documents or ERISA require the use of any particular representation of the national standard of care.  Accordingly, because the record supports finding that the Mihalik criteria are in line with national standards, the district court

10

did not err in finding that Defendant's consideration of the Mihalik criteria was proper.

### B.

The parties next dispute whether Plaintiff's continued partial hospitalization was medically necessary. The question of whether a proposed treatment is medically necessary is a factual determination and therefore reviewed for abuse of discretion. *Meditrust Fin. Servs.*, 168 F.3d at 214 ("The Plan persuasively argues that the decision to deny benefits based on lack of medical necessity involves a review of the facts in Revels's hospital records and a determination of whether there is factual support for her claim. . . . [T]hese medical assessments do not constitute an issue of contract interpretation. Deciding the medical progress of a patient through analysis of medical reports and records is similar to the factual determinations we have reviewed for abuse of discretion in other ERISA cases. Therefore, we affirm the district court's conclusion that it should review the Plan's decision for abuse of discretion because the Plan made a factual determination." (footnote omitted)).

Plaintiff contends that the district court erred in finding that Defendant's medical necessity determination was not an abuse of discretion because "[t]he treatment records clearly demonstrated that Ariana's PHP treatment at Avalon Hills was medically necessary because she exhibited self-harm as well as urges to engage in risky behavior severely detrimental to her health." We disagree.

Two medical reviewers considered Plaintiff's claim and concluded that continued partial hospitalization was not medically necessary. The two reviewing doctors agreed that Plaintiff was not an imminent danger to herself or others and that Plaintiff was medically stable. Doctor Prabhu further stated that Plaintiff could have received effective outpatient (as opposed to partial hospitalization) care. These conclusions were supported by substantial record

evidence.  Both doctors spoke directly with Plaintiff's treating physicians and reviewed relevant medical literature before making their coverage decisions.

Plaintiff disputes the reviewing doctor's conclusions, pointing to record evidence that she was "really not progressing very well," was "at [a] high risk of relapse," and was likely to continue restricting (not eating enough food) and over-exercising.  However, the reviewing doctors were aware of this information.  Indeed, the continued medical risks Plaintiff faced were extensively documented in Doctor Prabhu's report.  Nonetheless, the reviewing doctors found that an outpatient course of treatment was the most cost-effective way to mitigate Plaintiff's medical risk.  Specifically, Doctor Prabhu found that Plaintiff could "be safely treated in a less restrictive setting."

By the time that Plaintiff was denied continued coverage, the reviewing doctors found that her condition had stabilized.  Indeed, both reviewing doctors noted that Plaintiff had improved enough during her course of treatment to no longer be an imminent danger to herself or others.  Doctor Prabhu noted that Plaintiff had "made progress about her self harm (still has the thoughts and urges but doesn't anymore)."  Doctor Hartman agreed, noting that "[t]he patient denies suicidal ideation/homicidal ideation (SI/HI) or psychosis."  During her time at Avalon, Plaintiff also reached a healthy weight.  Based on this improvement, Doctor Prabhu concluded that Plaintiff "appear[ed] to be at her baseline behaviors."  Additionally, both doctors agreed that Plaintiff's progress in partial hospitalization treatment had stalled because Plaintiff was not invested in her course of treatment.

Moreover, that Plaintiff's doctors disagreed with Defendant's assessment of the proper level of care for Plaintiff's condition does not create a genuine issue of material fact.  *See, e.g.*, *Anderson*, 619 F.3d at 517 ("[ERISA plan administrator] was not obliged to accept the opinions of [plaintff's] treating physicians."); *Meditrust Fin. Servs.*, 168 F.3d at 215 n.7 (upholding

denial of benefits despite disagreement between reviewing doctors and treating physicians).  Indeed, our law is clear that "an administrator does not abuse its discretion by relying on the medical opinions of its consulting physicians instead of the medical opinions of a claimant's treating physicians." *Corry*, 499 F.3d at 402 (5th Cir. 2007).

It was not unreasonable on this record to conclude that Plaintiff could be treated with a less costly, equally effective outpatient treatment.  Because the plan's definition of medical necessity requires that the treatment not be "more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of the patients sickness or bodily injury[,]" substantial evidence supports Defendant's finding that further treatment at Avalon Hills was not medically necessary.

## IV.

We have considered Plaintiff's remaining arguments and find them without merit.  The district court's order granting Defendant summary judgment is AFFIRMED.

No. 16-20174

GREGG COSTA, Circuit Judge, joined by EDWARD C. PRADO and
STEPHEN A. HIGGINSON, Circuit Judges, specially concurring:

As any sports fan dismayed that instant replay did not overturn a blown
call learns, it is difficult to overcome a deferential standard of review.
[1] The deferential standard of review our court applies to ERISA decisions often
determines the outcome of disputes that are far more important than a
sporting event: decisions made by retirement and health plans during some of
life's most difficult times, as this case involving a teenager with a serious
eating disorder demonstrates. So it is striking that we are the only circuit that
would apply that deference to factual determinations made by an ERISA
administrator when the plan does not vest them with that discretion. *Compare
Pierre v. Conn. Gen. Life Ins. Co. of N. Am.*, 932 F.2d 1552, 1562 (5th Cir. 1991),
*with Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 250–51 (2d
Cir. 1999); *Luby v. Teamsters Health, Welfare & Pension Trust Funds*, 944 F.2d
1176, 1183–84 (3d Cir. 1991); *Reinking v. Phila. Am. Life Ins. Co.*, 910 F.2d
1210, 1213–14 (4th Cir. 1990) (*overruled on other grounds by Quesinberry v.
Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1030 (4th Cir. 1993)); *Rowan v. Unum
Life Ins. Co. of Am.*, 119 F.3d 433, 435–36 (6th Cir. 1997); *Ramsey v. Hercules,
Inc.*, 77 F.3d 199, 203–05 (7th Cir. 1996); *Walker v. Am. Home Shield Long
Term Disability Plan*, 180 F.3d 1065, 1070 (9th Cir. 1999); *Shaw v. Conn. Gen.
Life Ins. Co.*, 353 F.3d 1276, 1285 (11th Cir. 2003) (all applying *de novo* review
when the plan does not grant discretion).

*Pierre* did not have the benefit of this robust case law. It was writing
largely on a blank slate as only one other circuit (the Fourth) had at that time

---

[1] *See* NATIONAL FOOTBALL LEAGUE, OFFICIAL PLAYING RULES OF THE NATIONAL
FOOTBALL LEAGUE, R. 15, § 2, art. 3 (2016) ("A decision will be reversed only when the
Referee has *clear and obvious visual evidence* available that warrants the change."); *see also*
MAJOR LEAGUE BASEBALL, OFFICIAL BASEBALL RULES, R. 8.02(c) (2016).

ruled on the standard to apply to factual determinations in ERISA cases when the plan did not delegate discretion to the administrator. 932 F.2d at 1556–57. The unanimous view of the six other circuits that have weighed in on the other side of the split *Pierre* created, as well as other developments during the quarter century since we decided the question, calls our view into doubt.

*Pierre* turned largely on an interpretation of a then-recent Supreme Court case, *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989). *Pierre* had to decide whether the *de novo* standard of review discussed in *Firestone* applies only to interpretations of plan terms or also includes factual determinations of benefit eligibility. *Pierre*, 932 F.2d at 1556 (noting conflicting language in *Firestone* on this question). In addition to every other circuit reading *Firestone* differently,[2] a more recent Supreme Court decision— even if it does not "unequivocally direct[ ]" us to overrule our precedent[3]— counsels against *Pierre*'s reading. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008), lists the following as one of the "principles of review" that *Firestone* set forth: "Principles of trust law require courts to review a denial of plan benefits 'under a *de novo* standard' unless the plan provides to the contrary." *Id.* at 110–111 (quoting *Firestone*, 489 U.S. at 115). A "denial of plan benefits" may and often does encompass a denial based on factfinding. *Glenn* treats *de novo*

---

[2] Other circuits place considerable weight on the broad language *Firestone* used when describing review of an administrator's factual decision: "we hold that a denial of benefits . . . is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority *to determine eligibility for benefits* or to construe the terms of the plan." *Firestone*, 489 U.S. at 115 (emphasis added). A plan administrator generally makes factual determinations when determining the eligibility for benefits, so this language has been read broadly to apply *de novo* review to factual findings. *See, e.g.*, *Ramsey*, 77 F.3d at 202. Circuits also emphasize that deferring to the administrator when the plan does not vest her with fact-finding authority would "afford less protection to employees and their beneficiaries than they enjoyed before ERISA was enacted." *Rowan*, 199 F.3d at 436 (quoting *Firestone*, 489 U.S. at 114).

[3] *In re Tex. Grand Prairie Hotel Realty, LLC*, 710 F.3d 324, 331 (5th Cir. 2013) (quoting *Reed v. Fla. Metro. Univ., Inc.*, 681 F.3d 630, 648 (5th Cir. 2012) (noting this as the high standard needed for us to conclude that a Supreme Court opinion overrules our precedent)).

review as the general standard without limiting it to denials "based on plan *term* interpretations," the phrase that appeared in one *Firestone* passage on which *Pierre* placed much importance.  *Pierre*, 932 F.2d at 1556 (quoting *Firestone*, 489 U.S. at 108).

Apart from *Glenn*'s implication that *Pierre*'s deference is not warranted, one of the primary reasons we cited for that deference—that trust law draws a distinction between judicial review of a trustee's legal and factual decisions—has not withstood scrutiny.  Trust law traditionally provided different standards of review based on whether a decision was mandatory or discretionary according to the trust document, not whether that decision was factual or legal.  *Ramsey*, 77 F.3d at 203.  In a thorough discussion citing treatises on trust law as well as nineteenth century British and American cases, the Seventh Circuit found no basis for distinguishing legal questions from factual ones because "[e]ver since the English courts of equity developed the trust instrument, trustees have been answerable to the beneficiaries for a host of factually specific decisions, including reviews of accounts and investment decisions."  *Id.*  Another reason *Pierre* gave for finding a fact/law distinction in trust law—that factual decisions are "necessary or appropriate" for plan administration and thus are granted deference under the Restatement (Second) of Trusts (*see Pierre*, 932 F.2d at 1558)—applies with equal force to plan interpretations.  *See Rowan*, 119 F.3d at 436 (concluding that the Restatement language *Pierre* relied on "does not provide any basis for distinguishing between court review of factual determinations and review of interpretations of claim language").  One prominent scholar argues that *Firestone* got trust law wrong: "classic trust law assumed that the trustee had discretion unless the trust instrument or some particular doctrine of trust law provided otherwise," whereas *Firestone* says that the default standard is *de novo* and the plan has to grant discretion.  *Ramsey*, 77 F.3d at 203–04 (citing

John H. Langbein, *The Supreme Court Flunks Trusts*, 1990 SUP. CT. REV. 207, 219). So *Pierre* may well be correct in reading trust law as providing deferential review for fact-based decisions when the plan was silent. It failed to recognize, however, that *Firestone* "reversed the presumption." *Id.* at 204. As "there was and is no [trust law] distinction based on the kind of decision the trustee is making," *id.*, trust law's congruity for review of legal or factual questions would seem to support applying *Firestone*'s *de novo* standard to review of denials of any sort.

*Pierre*'s analogy to the limited factual review appellate courts give trial courts and administrative agencies has also been questioned. That deference is to a neutral factfinder, whereas ERISA plan administrators often have conflicts of interest as many both decide and pay claims. *Perez v. Aetna Life Ins. Co.*, 96 F.3d 813, 823–24 (6th Cir. 1996), *vacated for reh'g en banc*, 106 F.3d 146 (6th Cir. 1997); *see also Rowan*, 119 F.3d at 436. As the Seventh Circuit has explained, district courts and administrative agencies "enjoy [ ] a well established set of procedural protections that stem from the Constitution and individual statutes. Plan administrators, in contrast, neither enjoy the acknowledged expertise that justifies deferential review for agency cases, nor are they unbiased fact finders like the courts." *Ramsey,* 77 F.3d at 205 (internal citation omitted). *Glenn* reinforced this distinction, holding that judicial review should take account of a plan administrator's conflict even under the abuse of discretion review that governs when a plan grants discretion. 554 U.S. at 115. Granting those conflicted decisionmakers deference even when the plan does not call for it would "afford less protection to employees and their beneficiaries than they enjoyed before ERISA was enacted." *Rowan*, 119 F.3d at 436 (quoting *Firestone,* 489 U.S. at 114).

*Pierre* also voiced concerns about courts' ability to conduct *de novo* review of factual determinations, believing that it would be a "difficult and uncertain

exercise on a cold record." 932 F.2d at 1559. In the place of speculation, we now have the experience of seven other circuits. No administrative difficulties are evident from these circuit's *de novo* review of benefit denials that rest on factual determinations. Doctors' reports provide district courts with guidance on determining factual issues, and courts can appoint independent experts to evaluate complicated medical evidence. *See, e.g., Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1070–71 (9th Cir. 1999). When doctors' reports reach differing conclusions, it is well within the capabilities of a district court to determine which is more credible. *See Grady v. Paul Revere Life Ins. Co.*, 10 F. Supp. 2d 100, 113–14 (D. R. I. 1998) (evaluating how much exposure a reviewing doctor had with the claimant to decide whether the reviewing doctor's diagnosis was credible). That evaluation of medical testimony is something federal courts are much more familiar with now than when *Pierre* was decided given the advent of *Daubert* hearings. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

The pillars supporting *Pierre* may have thus eroded. This question concerning the standard of review for ERISA cases is not headline-grabbing. But it is one that potentially affects the millions of Fifth Circuit residents who rely on ERISA plans for their medical care and retirement security. When decisions by those plans are challenged in court, *Pierre* matters now much more than it did. Texas's anti-delegation statue (assuming it is not preempted) means that the abuse of discretion standard is no longer dictated for most cases by plan provisions vesting discretion, but by *Pierre*'s default deference. And the circuit split on that default standard undermines the uniform treatment of ERISA plans—sometimes the same plan offered by employers in different states—that the federal statute seeks to achieve. *Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 944 (2016).

No. 16-20174

The default standard for judicial review of fact-based ERISA decisions was a significant enough question for two Justices to vote to review *Pierre* after it created a split with the Fourth Circuit. *Pierre*, 502 U.S. 973, 973–74 (1991). The lopsided split that now exists cries out for resolution.